## NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

08-1549

STATE OF LOUISIANA

VERSUS

G.R.H.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NO. 113225, DIV. L
HONORABLE MARILYN CASTLE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**J. DAVID PAINTER**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Marc T. Amy, Elizabeth A. Pickett, and J. David Painter, Judges.

**AFFIRMED.**

**Thomas E. Guilbeau, Attorney at Law**
**P.O. Box 3331**
**Lafayette, LA 70502**
**Counsel for Defendant-Appellant:**
        **G.R.H.**

**Keith B. Nordyke**
**Nordyke and Greenfield, L.L.C.**
**427 Mayflower Street**
**Baton Rouge, LA 70802**
**Counsel for Defendant-Appellant:**
        **G.R.H.**

**Michael Harson, District Attorney**
**Keith A. Stutes, Assistant District Attorney**
**Office of the District Attorney**

**P.O. Box 3306**
**Lafayette, LA 70502**
**Counsel for Appellee:**
    **State of Louisiana**

**PAINTER, Judge.**

Defendant, G.R.H., was charged with one count of aggravated rape, a violation of La.R.S. 14:42; and two counts of molestation of a juvenile, violations of La.R.S. 14:81.2.[1] After a jury found him guilty as charged, he was sentenced to life imprisonment at hard labor. Defendant now appeals his conviction and sentence. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was accused of raping his niece, P.B., who was under the age of twelve at the time of the offense. The bill of indictment charged that the offense occurred between 1966 and 1972. Defendant was charged by bill of indictment filed on October 25, 2006, with one count of aggravated rape, a violation of La.R.S. 14:42; and two counts of molestation of a juvenile, violations of La.R.S. 14:81.2. A written plea of not guilty was filed on November 28, 2006.

A Motion for Severance of Offenses was filed on February 7, 2007. On July 17, 2008, the State moved to sever the offenses of molestation of a juvenile and proceed to trial on the charge of aggravated rape. Trial commenced on July 16, 2008, and the following day, the jury found the Defendant guilty as charged. On July 31, 2008, the trial court sentenced the Defendant to life imprisonment at hard labor. A Motion for Appeal was subsequently granted, and Defendant is now before this court asserting the following six assignments of error:

> 1) The Trial Court erred in failing to dismiss the prosecution as time barred and as a violation of the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section two of the Louisiana Constitution.

---

[1]Initials of Defendant and several other witnesses in this matter are used so that the identity of the victim may not be ascertained in accordance with La.R.S. 46:1844(W).

2) The Trial Court erred in allowing other crimes evidence of the alleged sexual touching of two nieces C.H. and D.H.[2]

3) The Trial Court erred in imposing a sentence of life imprisonment when the jurisprudence would permit only a twenty year sentence.

4) If this Court rules that the prosecution was capital in nature, then procedural rules in effect in 1972 should be applied and a reversal is mandatory.

5) Under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), the evidence was insufficient to sustain this conviction.

6) G.R.H. requests that this Honorable Court determine if there are unbriefed errors patent and reverse for same.

For the following reasons, we find that these assignments of error lack merit, and we affirm Defendant's conviction and sentence.

## DISCUSSION

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After a thorough review of the record in this case, we find that there are no errors patent.

*Sufficiency of Evidence*

"When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence." *State v. Hearold*, 603 So.2d 731, 734 (La.1992). Thus, we first address Defendant's fifth assignment of error wherein he contends that the evidence was insufficient to sustain his conviction.

In evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine whether, viewing the

---

[2]The parties refer to C.H. in briefs to this court and C.H. was listed as a victim in the bill of indictment. C.H. is married and is now known as C.G. However, we will refer to this witness as C.H. throughout this memorandum.

evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984). Additionally, where circumstantial evidence forms the basis of the conviction, the evidence must exclude every reasonable hypothesis of innocence, "assuming every fact to be proved that the evidence tends to prove." La. R.S. 15:438; *see State v. Neal*, 2000-0674 p. 9 (La.6/29/01), 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). The statutory requirement of La. R.S. 15:438 "works with the *Jackson* constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury." *Neal*, 2000-0674 p. 9, 796 So.2d at 657.

*State v. Draughn*, 05-1825, p. 7 (La. 1/17/07), 950 So.2d 583, 592, *cert. denied*, __

U.S. __, 128 S.Ct. 537 (2007).

Defendant was convicted of aggravated rape occurring between 1966 and 1972.

During that time, La.R.S. 14:42 defined aggravated rape as follows:[3]

"Aggravated rape is a rape committed where the sexual intercourse is deemed to be without the lawful consent of the female because it is committed under any one or more of the following circumstances:

. . . .

"(3) Where she is under the age of twelve years. Lack of knowledge of the female's age shall not be a defense.

*State v. Miller*, 111 So.2d 108, 111 (La.1959).

P.B. testified that during the 1960's she spent the night at the home of her uncle, the Defendant, and her aunt, P.H., many times. She recalled sharing the room with their daughter, who was in a crib, and that Defendant came into the room looming over her. P.B. further testified that Defendant would have her walk around the bedroom and then he would rub her genitals inside and outside her clothing. P.B.

---

[3]We quote the statute as it existed in 1950. It appears the statute was not changed until 1975 by La.Acts No. 612, which amended and reenacted Title 14, § 42 of the Louisiana Revised Statutes of 1950.

was not sure if Defendant's fingers went inside her vagina. P.B. further testified that Defendant masturbated in her presence. These acts occurred every time P.B. went to Defendant's home in Broussard, and she was there no less than one to two times a month for a least one to two nights.

The following exchange occurred regarding P.B.'s age at the time of these events:

Q. There's public records downstairs in the clerk's office that indicate [the Defendant's daughter's] date of birth is in 1968. You were born in 1966. Does that fit --

A. '64. '62. Excuse me.

Q. '62? '62. I'm sorry. So you were born in '62. She was born in '68.

A. Okay.

Q. All right. So, when she was a young child, in 1968, this is when the acts began to start on you?

A. Yes.

Q. So, by that figuring, in 1968, you were about how old?

A. Six.

P.B.'s date of birth was August 30, 1962.

P.B. testified that while Defendant lived in a house on La Neuville Road, he would enter the bedroom where P.B. slept and rub her vagina. P.B. was eight or nine years old at the time, and Defendant's daughter was in bed with her. P.B. further testified that Defendant would enter the bedroom, kneel over her, "have his hands on it, in my vagina," masturbate to orgasm, "leave it on me," wipe her with her own underwear, then leave the room. P.B. was also eight or nine years old when this occurred. P.B. stated that Defendant's wife was across the hall during these events and that her bedroom door was open. P.B. also testified that Defendant began

4

rubbing his penis on her while he masturbated and "would insert it enough" and then ejaculate on her. She was then asked, "Did he actually insert his penis fully into you," and she responded, "Not full. I was a kid. But it was in." P.B. further stated that she would hit Defendant and that he would go away, but this was usually after he had already "finished." P.B. testified that Defendant did this more than twenty times. P. B. further testified that on many occasions, Defendant partially inserted his penis into her vagina. P.B. indicated that she experienced pain during these events and that she would cry and say stop. However, she did not scream at the top of her lungs. P.B. testified that Defendant subsequently began to fondle her and masturbate while they watched television.

P.B. stated that she was ten or eleven years old when she refused to go to Defendant's home. When she was approximately fifteen or sixteen, she told her mother what Defendant had done to her. P.B. testified that her mother informed her that she had reported the events to the police and nothing could be done because too much time had passed. P.B. testified that she told her aunt, P.H., about these events the night of her senior prom and that P.H. told her she was lying.

In 2006, P.B. went to her mother's home to see her cousin C.H.'s baby. P.B. testified that when she saw C.H., she "saw her eyes, and I knew." D.H. also came over during P.B.'s visit, and D.H. had the same look. P.B. testified that she went home and prayed and decided to go to the police. Before going to the police, P.B. called C.H. and asked if Defendant had done anything to her. P.B. testified that C.H. cried and said yes. P.B. then informed C.H. that she was going to the police, and C.H. told her not to.

5

C.A., P.B.'s mother, testified that when P.B. was a child she spent the night with Defendant and his wife on a regular basis. C.A. further testified that when P.B. was eight or nine years old she started seeing a tremendous change in P.B. P.B. went from being a real sweet person to a "very rebellious, angry, mean little girl." When C.A. would mention Defendant and his wife, P.B. would get angry. P.B. did not stay overnight at Defendant's home after that.

C.A. further testified that when she told P.B. they would be attending a family function, P.B. did not want to go. At age sixteen, P.B. told C.A. that Defendant molested her. Also, when P.B. got married at age seventeen, she did not want Defendant to attend the ceremony. C.A. testified that after P.B. told her she was molested, C.A. told her mother and Defendant's wife. C.A. stated that she was told she was a troublemaker and a liar and had better keep this information to herself. C.A. testified that she spoke to the police, who told her it would be P.B.'s word against that of Defendant. C.A. said she did not pursue the matter because she thought it would cause embarrassment for P.B., who was getting married at that time. C.A. spoke to the police again in July of 2006, after P.B. reported the events to police.

C.H., who was born on November 3, 1980, testified that Defendant was her uncle. C.H. testified that during the summer of 2006, P.B. contacted her at work and told her that she was at the police department giving a statement. C.H. testified that P.B. saw her baby after P.B. gave a statement to police. C.H. also testified that P.B. saw her baby the day before P.B. gave her statement to police. However, the two did not speak to each other at that time. C.H. subsequently told P.B. that she had been molested but did not provide P.B. with any details regarding the molestation. C.H. then met with police.

C.H. testified that when she was nine or ten years old, she was on a four-wheeler with Defendant, who rode behind her. During the four-wheeler ride, Defendant massaged her vagina and thrust his penis on her back. C.H. immediately asked Defendant to stop the four-wheeler so she could go to the restroom. During the same weekend, C.H. and a cousin were lying on the floor in Defendant's living room when Defendant rubbed her vagina under her nightgown. C.H. testified that she told Defendant to stop and that she would tell someone. Defendant then told C.H. if she ever told anyone, he would "stick his dick in [her] mouth to keep [her] quiet." C.H. testified that when she was twelve, she told her friend what had occurred. The friend's parents reported the events to C.H.'s parents. C.H.'s parents then questioned her about the events and called the police. C.H. testified that she told her parents she did not want to pursue charges.

A.S. testified that C.H. worked with her and that C.H. was not a very honest person.

D.H., who was born on May 13, 1984, testified that Defendant was her uncle. D.H. testified that when she was seven or eight years old, Defendant put his hand under her skirt and his fingers inside her underwear. D.H. further testified that "whenever it got to the fold of my butt cheek, I pulled away." On another occasion, Defendant rubbed her chest over her shirt. D.H. reported these events to police in 2006, after P.B. and C.H. made reports to police.

D.S. testified that Defendant was her uncle and that he had never done anything inappropriate to her. D.S. was born on November 10, 1973. She testified that between 1978 and 1988, she visited Defendant's residence, but did not recall being left alone with him.

7

P.H., Defendant's wife, testified that P.B. was her niece and godchild. In 1966, Defendant joined the Navy and went to basic training in California and was later stationed in Florida and Virginia. During most of that time, P.H. lived with Defendant's mother. Defendant left the Navy in August or September of 1968, and the two subsequently rented a house in Broussard. At that time, P.B. was six years old. P.H. and Defendant lived in that house until some time in 1969.

P.H. testified that while they lived in Broussard, the bedroom doors were open when they slept and while P.B. slept in the room with P.H.'s daughter. P.H. further testified that she never noticed any blood or semen while washing P.B.'s clothes. Additionally, she never heard P.B. cry during the night.

P.H. and Defendant later rented a house on La Neuville Road. She did not notice any blood or semen or hear cries from P.B. at that residence. P.H. and Defendant lived in that residence for one year and then moved into the home of Defendant's grandmother while they built a home. The new home was located on Bonin Road and construction began on October 5, 1970. P.B. spent the night more often after the home was built. P.H. did not notice anything unusual at the home on Bonin Road when she bathed P.B. and washed her clothes.

P.H. further testified that P.B. stopped spending the night at her home once P.B. became a teenager. According to P.H., P.B. did not become rebellious and did not show any anger toward Defendant. P.H. further testified that C.H. and D.H. would spend time at her home and played with her granddaughter, A.C. P.H. did not notice a change in Defendant's relationships with C.H. and D.H. P.H. indicated that she first heard the allegations regarding P.B., C.H., and D.H. when Defendant was arrested.

Donald Arcenaux was employed by the Lafayette Parish Sheriff's Office on October 23, 1993. On that date, he was called in reference to a complaint regarding indecent behavior with a juvenile. The victim of that offense was C.H. The following day, C.H. recanted her statement.

Bobby Ayo testified that Defendant had an outstanding reputation in the community. However, Ayo did not know Defendant from 1968 to 1972. Additionally, he never asked Defendant about having sex with girls.

Debra Guillot helped P.H. make jewelry for C.H.'s wedding. Debra testified that neither D.H. nor C.H. were apprehensive in Defendant's presence. However, Debra admitted she did not know D.H. and C.H. when they were children.

S.B. testified that she spent the night with Defendant's daughter before she was twelve years old and that Defendant did not do anything inappropriate to her. S.B. was born in 1969.

A.C., Defendant's granddaughter, testified that she lived with Defendant when she was a child and moved out when she was ten or eleven years old. A.C. further testified that Defendant never did anything inappropriate to her. A.C. stated that she played with C.H. and D.H. and that they never told her that Defendant did anything inappropriate and that they did not appear to be afraid of him. A.C. testified that she never told the father of her child that Defendant did anything inappropriate to her. She admitted that she was not alive during the years P.B. alleged she was raped by Defendant.

Defendant testified that he joined the Navy in 1965. He subsequently married P.H. on May 14, 1966. P.B. was four years old at that time. Thereafter, he began active duty in the fall in Mayport Beach, Florida. During periods of leave, he

9

returned to Louisiana. His tour of active duty ended in September 1968. When he left the Navy, Defendant and P.H. rented a house in Broussard. Defendant denied all claims regarding acts that were alleged to have occurred during the time he lived in Broussard. Defendant also denied touching P.B. inappropriately at the home on Bonin Road. Defendant further denied any inappropriate contact with C.H. and D.H.

E.B. testified that he had a child with A.C. and that the two were together for two-and-a-half years. E.B. testified that A.C. cried and told him that Defendant touched her while they were riding a four-wheeler and that Defendant started coming into her bedroom. E.B. indicated that this conversation occurred in late 2005 or early 2006. E.B. testified that he did not like Defendant's wife because she claimed that he punched her in the jaw. E.B. pled no contest to a charge regarding this event and was on probation at the time he testified.

At trial, there was testimony regarding P.B.'s mother, C.A., being disinherited by her mother. Additionally, there was testimony that P.B., C.H., and D.H. continued to associate with Defendant after the alleged acts of rape and molestation. Furthermore, there was testimony regarding an altercation between Defendant and the father of C.H. and D.H.

In brief to this court, Defendant asserts that a sufficiency review is warranted because the State did not establish when the offense occurred. Defendant further asserts that a six-year time span is insufficient as a matter of due process to put him on adequate notice to prepare a defense. Further, such a lengthy period of time does not establish with certainty the time at which the offense occurred. Additionally, Defendant asserts that P.B. was not able to establish if and when penetration actually

occurred. Defendant then asserts that even if this court believes "something" happened, there is insufficient proof to establish that the "something" was rape.

The date of the offense is not an essential element of the crime of aggravated rape. *State v. D.T.*, 08-814, p. 23 (La.App. 3 Cir. 12/11/08), 998 So.2d 1258, 1274. Thus, the State was not required to prove the date on which Defendant raped P.B.

P.B. testified that Defendant "would insert it enough" and then ejaculate on her. She was asked, "Did he actually insert his penis fully into you," and she responded, "Not full. I was a kid. But it was in." P. B. also testified that on many occasions, Defendant partially inserted his penis into her vagina.

In *State v. Waguespack*, 06-410, p. 2 (La.App. 3 Cir. 9/27/06), 939 So.2d 636, 638, this court stated, "In *State v. Ross*, 03-564, p. 11 (La.App. 3 Cir. 12/17/03), 861 So.2d 888, 895, *writ denied*, 04-0376 (La. 6/25/04), 876 So.2d 829, we defined sexual penetration as, '[a]ny penetration, however slight, of the aperture of the female genitalia, even its external features, is sufficient.'" Thus, we find that P.B.'s testimony supports the element of penetration required to prove that a rape occurred. Furthermore, "[a] rape victim's testimony alone is sufficient to establish the fact of penetration. *State v. Mitchell*, 453 So.2d 1260 (La.App. 3 Cir.), *writ denied*, 457 So.2d 16 (La.1984)." *State v. H.J.L.*, 08-823, p. 5 (La.App. 3 Cir. 12/10/08), 999 So.2d 338, 342.

Based on the jury's verdict, we find that the jury chose to believe the testimony of P.B. That credibility determination should not be second-guessed by this court. *State v. Marshall*, 04-3139 (La. 11/29/06), 943 So.2d 362, *cert. denied*, __ U.S. __, 128 S.Ct. 239 (2007). This assignment of error lacks merit.

11

*Due Process and Time Limitation*

In his first assignment of error, Defendant contends that the due process clauses of the United State's Constitution and the Louisiana Constitution require that this prosecution be dismissed.

Defendant filed a Motion to Quash on February 16, 2007. In the motion and memorandum in support thereof, Defendant asserted that the indictment should be quashed because the time limitation for the institution of prosecution had expired and the amount of time that had "passed since the charged offense was alleged to have occurred has caused and will cause substantial prejudice" to his defense. The trial court denied the motion.

In brief to this court, Defendant cites the following portion of Judge Downing's concurrence in part, dissent in part, in *State v. Smith*, 01-1027, p. 1 (La.App. 1 Cir. 2/15/05), 809 So.2d 566-67 (citation omitted):

> Where there is no corroborating evidence of a crime, a passage of time of such length that an accused is prevented from preparing a defense should be sufficient grounds to hold that due process is violated. Who among us can account for what they did on an unspecified day in November 1976? When someone truly believes a memory that is false there is no way for a trier of fact to distinguish the truth by the demeanor of the witness. How can we know if a memory is true? . . . .
>
> During the 1980's criminal prosecutions based on "repressed memories" sent many an innocent person to jail for crimes alleged to have been committed decades before the victim "remembered" the abuse.

Defendant then asserts that this prosecution must be dismissed since a forty-year delay in bringing the charges is too long and is a due process violation. He further asserts he was denied a fair trial. Defendant contends that he was forced to defend his actions during a six-year period forty years ago, which was virtually impossible and that this prejudice alone should be considered a violation of

12

substantive due process sufficient to reverse his conviction. Defendant then discusses *Smith*, 809 So.2d 556, which he alleges involved a delay half as long as the delay in the case at bar. Defendant then argues that the forty-year delay in the case at bar should be presumed prejudicial. Defendant further argues that he has been prejudiced by the use of other crimes evidence admitted pursuant to La.Code Evid. art. 412.2, because that article did not exist until recently.

Defendant next discusses *State v. Gray*, 917 S.W.2d 668 (Tenn.1996), a Tennessee case involving a prosecutorial delay from 1950 to 1992. The Tennessee Supreme Court reversed the defendant's conviction citing the defendant's Fifth Amendment right to due process. Defendant goes on to argue that the prejudice in the case at bar is greater than that in *Gray*.

Defendant also asserts that P.B.'s memory has been diminished, as she was unable to distinguish between the alleged rape and touching. Furthermore, he alleges that a review of testimony of all of the witnesses will reveal sufficient incidences of failure to recall due to the passage of time. Defendant goes on to assert that this court "should draw a bright line rule prohibiting prosecutions for offenses such as these without both corroboration and contemporaneous report to the authorities."

Defendant further asserts the time limitation for bringing the prosecution has passed. In support of this argument, Defendant asserts that because the death penalty could no longer be applied in the case at bar, the case was no longer capital and the unlimited time limits for prosecution under La.Code Crim.P. art. 571 do not apply. Thus, La.Code Crim.P. art. 572 would mandate that this case be dismissed, as the six-year time limitation for prosecution has run.

The State contends that Defendant was charged within the prosecutorial time limits. The State asserts that although imposition of the death penalty for aggravated rape was declared unconstitutional, La.Code Crim.P. art. 571 was still applicable and that there was no prescriptive period for filing of the aggravated rape charge in the case at bar. The State maintains this issue was considered in *Smith*, 809 So.2d 556. The State further asserts there is no evidence that the delay in the filing of the indictment in the case at bar was purposeful on its part.

We first address Defendant's claim that the time for instituting prosecution in the case at bar had run. At the time of the offense, aggravated rape was punishable by death, and La.Code Crim.P. art. 571 provided: "There is no time limitation upon the institution of prosecution for any crime for which the death penalty may be imposed." Additionally, prior to 1984, La.Code Crim.P. art. 572 provided that:

> No person shall be prosecuted, tried, or punished for an offense not punishable by death unless the prosecution is instituted within the following periods of time after the offense has been committed:
>
> (1) Six years, for a felony necessarily punishable by imprisonment at hard labor . . . .

Noting that La.R.S. 14:42 was amended by Acts No. 343, § 1, effective September 9, 1977, to provide a penalty of life imprisonment without the benefit of parole, this court discussed the application of capital protections in *State v. Breaux*, 08-1061, pp. 2-5 (La.App. 3 Cir. 4/1/09), __ So.3d __, as follows (alterations in original) (footnote omitted):

> Between 1950 and September 8, 1977, the penalty for a violation of La.R.S. 14:42 was death. Most of the alleged violations by Defendant occurred during this period.
>
> In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726 (1972), the United States Supreme Court reviewed a murder and two rape cases and held the imposition and carrying out of the death penalty in those three

14

cases constituted cruel and unusual punishment in violation of the eighth and fourteenth amendments.

Thereafter, in *State v. Selman,* 300 So.2d 467 (La.1974), the Louisiana Supreme Court considered the question of whether amendments to La.Code Crim.P. arts. 814 and 817 relative to qualifying verdicts, made by the legislature after *Furman* was decided, removed the infirmities in our law which precluded the imposition of the death penalty for aggravated rape in Louisiana since *Furman.* After discussing the nature of the crime of aggravated rape in light of the eighth and fourteenth amendments of the United States Constitution and with an eye to the infirmities that caused the reversal of the convictions in *Furman,* we concluded "that the death penalty for aggravated rape is not per se cruel and unusual punishment." *Id.* at 472.

However, in *Selman v. Louisiana,* 428 U.S. 906, 96 S.Ct. 3214 (1976), the United States Supreme Court disagreed with the Louisiana Supreme Court and held that the imposition and carrying out of the death penalty for an aggravated rape conviction in Louisiana constituted cruel and unusual punishment.

Consequently, at the time Defendant allegedly committed most of the offensive acts at issue herein, the penalty for these offenses was death (although that penalty could not be carried out at the time of trial). Thus, the question arises as to whether the procedural rules applicable to the prosecution of capital offenses should have been applied in Defendant's case.

In *State v. Rich,* 368 So.2d 1083 (La.1979), the defendant was convicted of aggravated rape which occurred in August 1977. At that time, aggravated rape was a capital crime in Louisiana, but imposition of the death penalty was not legally available in Louisiana. The trial court had refused to sequester the jury, despite the defendant's request that it be done, and had instructed the jury that ten jurors, rather than twelve, needed to concur in order to reach a verdict. On review, the supreme court recognized as an error patent the trial judge's failure to procedurally treat the case as less than that of a capital offense. Accordingly, Rich's conviction and sentence were reversed, and the matter was remanded for a new trial.

However, in *State v. Carter,* 362 So.2d 510 (La.1978), the supreme court held differently. The court addressed the issue of misjoinder of aggravated rape (a capital offense at the time of commission of the offenses) with aggravated crime against nature and aggravated burglary (both punishable by confinement necessarily at hard labor) because the modes of trial differed and held there was not a misjoinder, explaining, in pertinent part:

15

The mode of trial is determined by the possible penalty. *La. Const. art. 1, § 17: State v. McZeal* [, *on rehearing,* 352 So.2d 592 (La.1977) ], *supra.* Whereas aggravated rape, prior to the effective date of Act 343 of 1977, as a capital offense, was triable before a jury of twelve persons, all of whom must concur to render a verdict, the offense is now punishable by confinement necessarily at hard labor and is therefore triable before a jury of twelve persons, ten of whom must concur to render a verdict. Hence, the mode of trial for aggravated rape was changed as a result of the amendment to its penalty provision. Moreover, this change is procedural in nature. *State v. McZeal, supra*; *State v. Holmes*, 263 La. 685, 269 So.2d 207 (1972). *A procedural change which does not affect an accused's substantive rights in the prosecution of a criminal offense is applicable to the trial of the offense after the effective date of the change even though the particular offense was committed prior to that date.*

*Id.* at 513 (emphasis added) (footnote omitted).

In *State v. Williams,* 372 So.2d 559 (La.1979), the supreme court discussed the split in the court in the holdings of *Rich* and *Carter* and held:

The writ is denied. On reconsideration of the common problem in *State of Louisiana v. Dave Carter,* 362 So.2d 510 (La.1978) and *State of La. v. Rich,* 368 So.2d 1083, 1979[sic], a majority of the court has decided that the better treatment is found in *State v. Rich. The unanimous verdict, the sequestration of the jury and other safeguards erected by statute for capital cases are too important to permit them to be retroactively erased.* Therefore, the jury in an aggravated rape case, when the rape occurred prior to September 9, 1977, the effective date of Act 343 of 1977, should return a unanimous verdict.

*Id.* at 560 (emphasis added).

In *State v. Goodley*, 398 So.2d 1068 (La.1981), the defendant was charged with first degree murder. The jury returned a responsive verdict of manslaughter, with ten of the twelve jurors concurring in the verdict. On error patent review, the supreme court reviewed whether or not the non-unanimous verdict was valid and held in pertinent part:

The Legislature, in enacting the controlling provision herein, relied on the severity of the punishment provided for a crime as the basis for its classification

16

scheme in providing the number of jurors which must compose a jury and the number of jurors which must concur to render a verdict....

Thus, the Legislature determined that for crimes that were so serious as to validly carry the death penalty, certain special procedural rules were additionally required, among which was the requirement of a unanimous jury to render a verdict. This determination is not based on an after the fact examination of what crime the defendant may eventually be convicted of, nor is it based on an after the fact examination of what sentence he receives. Rather, the scheme is based on a determination by the Legislature that certain crimes are so serious that they require more strict procedural safeguards than other less serious crimes. *It was determined that in charged capital offenses a unanimous verdict for conviction, not just sentencing, is necessary and there is no attendant provision giving the state the authority to alter that scheme on its own motion by simply stipulating that the death penalty will not be sought in a certain case.*

. . . .

[W]e find that a unanimous jury is required in a case where the defendant is being prosecuted under an unamended charge of first degree murder, a capital offense, to render any verdict, notwithstanding the fact that the state may have stipulated that it would not seek the death penalty.

*Id.* at 1070-71 (emphasis added) (footnote omitted). In footnote four of the opinion, the court stated:

This Court considered a similar issue in *State v. Jones*, 385 So.2d 786 (La.1980)[,] and in a brief per curiam writ grant in response to a pre-trial writ application recited that the "(c)rime of aggravated kidnapping is not capital, nor is it capital for procedural purposes." However, *Jones* is distinguishable from the case under consideration because *Jones* involved a situation where the death penalty provision had been declared unconstitutional, whereas here the death penalty provision is valid and enforceable, making first degree murder "a criminal case in which the punishment may be capital."

*Id.* at 1071.

In *State v. Self,* 98-39 (La.App. 3 Cir. 8/19/98), 719 So.2d 100, *writ denied,* 98-2454 (La.1/8/99), 734 So.2d 1229, this court referred to *Jones.* In *Self,* the defendant was charged with committing aggravated rape of a child under the age of twelve between June 1995 and March 1996. At that time, the Legislature had again amended La.R.S. 14:42 to provide the penalty was death, but the state waived the option of pursuing the death penalty. On appeal, this court addressed whether the trial court erred in instructing the jury that they were required to reach a verdict of ten out of twelve rather than a unanimous verdict as required for capital cases under La.Code Crim.P. art. 782 and whether the trial court erred in accepting the jury's non-unanimous verdict of eleven to one. Citing *Goodley,* this court held that because the death penalty was applicable at the time the defendant committed the act, the capital procedural rule of a unanimous jury applied. We further noted that the court in *Goodley* distinguished *Jones* based on the fact that *Jones* dealt with an offense wherein the death penalty had been declared unconstitutional.

In *State v. Schrader,* 518 So.2d 1024 (La.1988), *cert. denied,* 498 U.S. 903, 111 S.Ct. 265 (1990), the supreme court appeared to back away from footnote number four in *Goodley* which distinguished *Jones.* In *Schrader,* the defendant was charged with first degree murder, and the jury returned a responsive verdict of manslaughter. On error patent review, it was discovered that the jury had not been sequestered even though the charge was classified as a capital offense. The court stated, in pertinent part:

> We now hold, despite its long lineage, the jurisprudential presumption of prejudice for "capital cases" does not apply to a "capital case" where the defendant never faced the prospect of the death penalty and where counsel failed to press the point in the trial court, or object to the lack of sequestration. In the absence of actual prejudice, this right to sequestration is waived.
>
> . . . .
>
> In the present case the defendant did not object to the lack of sequestration. Moreover, the potential impact on the fairness of the proceedings was no greater than for non-capital cases. It is true that the case remained "capital" under the procedural classification of our statutes; however, it was in fact not capital in the sense of the cases such as *Parker* and *Luquette* wherein this court presumed prejudice. That is, the defendant did not face the death penalty, nor did the jury face the heightened pressure inherent in having to consider the death penalty.

18

Accordingly, the failure to sequester the jury in this case was not reversible error.

*Id.* at 1037-38.

In *State v. Marcantel,* 98-825 (La.App. 3 Cir. 12/22/99), 756 So.2d 366, *writ denied,* 00-208 (La.8/31/00), 766 So.2d 1274, the defendant was charged with having committed aggravated rape of a victim under the age of twelve in 1996. On error patent review, this court addressed the issue of whether the jurors were sequestered from the moment they were sworn, as required by La.Code Crim.P. art. 791(B) in capital cases. This court explained, in pertinent part:

Although the State did not seek the death penalty, the case retained its capital classification for procedural purposes. *State v. Schrader*, 518 So.2d 1024 (La.1988), *cert. denied,* 498 U.S. 903, 111 S.Ct. 265, 112 L.Ed.2d 221 (1990). The charge, aggravated rape of a child under twelve, is punishable by death or life imprisonment. The record does not tell us why the State chose not to seek the death penalty. It is possible that the State or the trial court was under the belief that the death penalty had been declared unconstitutional.

. . . .

The present case is distinguishable from *Schrader* because the death penalty in the present case was ruled unconstitutional by district courts rather than by the United States Supreme Court. Additionally, the State's reason for not seeking the death penalty is unclear. Nevertheless, because the Defendant was not exposed to the death penalty, did not object to the lack of sequestration, and does not allege on appeal that he was prejudiced by the lack of sequestration, we find that the lack of sequestration (if the jury was in fact not sequestered) was harmless error.

*Id.* at 368-69.

Additionally, in *State v. Smith,* 01-1027 (La.App. 1 Cir. 2/15/02), 809 So.2d 556, the defendant was charged with having committed aggravated rape of a juvenile under the age of twelve in November 1976. In his writ application, the defendant argued that the trial court erred in denying his motion to quash indictment because the statute of limitations had run. More specifically, he argued that "because the death penalty for the aggravated rape statute in effect on the date of the offense had been declared unconstitutional, the offense was not a capital offense and, thus, the unlimited prescriptive period of La.Code Crim.P.

19

art. 571 for instituting prosecution in capital cases did not apply." *Id.* at 561. On writ of review, the appellate court held in pertinent part:

> [A]lthough the death penalty may not be imposed in the instant case, article 571 still applies and there is no prescriptive period for the aggravated rape charge. Because the unlimited prescriptive period for capital cases applies, the court did not err when it denied the "motion to quash indictment because of running of statute of limitations."

*Id.* at 562.

In light of the foregoing, we conclude that the procedural rules for capital cases, such as unanimous jury and sequestration of the jury, should have been applied in this case.

Based on *Breaux*, we find that the case at bar is a capital case and that no prescriptive period applies to the aggravated rape charge at issue.

We now address the Defendant's claim that the prosecution should be dismissed because of a due process violation.

In *Smith*, 809 So.2d 556, the court discussed preindictment and prearrest delays as follows:

> Constitutional guarantees to a speedy trial are not invoked until a citizen becomes an accused, either by arrest or indictment. *United States v. Marion*, 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971); *State v. Schrader*, 518 So.2d 1024, 1028 (La.1988). For preaccusation delay, due process is the standard. The proper approach in determining whether the accused has been denied due process of law through preindictment or prearrest delay is to measure the government's justifications for the delay against the degree of prejudice suffered by the accused. *Schrader*, 518 So.2d at 1028 (quoting *State v. Malvo*, 357 So.2d 1084, 1087 (La.1978)).
>
> The U.S. Supreme Court distinguishes between "tactical" delay and "investigative" delay. To show a violation of due process from preindictment tactical delay, a defendant must show that the government deliberately delayed bringing the indictment in order to gain a tactical advantage and that the delay caused the defendant actual and substantial prejudice in presenting his defense. *State v. Dickerson*, 529 So.2d 434, 439 (La.App. 1st Cir.), *writ denied*, 533 So.2d 353 (La.1988). *See also United States v. Lovasco*, 431 U.S. 783, 795 n. 17, 97 S.Ct. 2044, 2051 n. 17, 52 L.Ed.2d 752 (1977); *Marion*, 404 U.S. at 324, 92 S.Ct. at 465;

*State v. Hughes*, 94-1364, p. 6 (La.App. 4th Cir.12/28/94), 648 So.2d 490, 493, *writ denied*, 95-0255 (La.3/24/95), 651 So.2d 292. In *Lovasco*, the U.S. Supreme Court held "that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." 431 U.S. at 796, 97 S.Ct. at 2051-52.

To prove prejudice resulting from tactical delay, the defendant's showing must be concrete, not speculative. Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice. *See Dickerson*, 529 So.2d at 439-40 (quoting *United States v. Antonino*, 830 F.2d 798, 805 (7th Cir.1987)). In *Dickerson*, this court placed on the defendant the burden of establishing the government deliberately delayed bringing the indictment in order to gain a tactical advantage. In *Schrader*, the Louisiana Supreme Court, in balancing the reasons for the delay with the resulting prejudice, noted that the state had offered no evidence regarding the reasons for the delay. 518 So.2d at 1028. Such a comment appears to require the state, not the defense, to show the reasons for the delay. Even if the state has an obligation to present its reasons for the delay, the defense has the ultimate burden of proving bad faith on the part of the state.

In *Schrader*, there was an almost 15-year delay between the offense (a murder resulting from arson) and the indictment. The court found no prejudice resulting from the defendant's inability to examine the site as it existed after the fire. The court explained that the defendant was able to present testimony from both of the men who originally investigated the blaze. The court also noted that witnesses who had heard the defendant's threat to burn down the house did not tell the authorities about those threats until after the defendant's arrest.

In the instant case, the offense allegedly occurred in November of 1976, and the indictment was issued in September of 1996. The reason for the state's almost twenty-year delay in filing the indictment is not evident from the record, and it is not clear when the authorities became aware of the alleged rape. The victim's medical records (filed under seal) indicate that, before the rape was reported to the authorities, the victim had told her mother and two friends about the rape. In 1996, the victim was "confronted" about the rape after defendant was arrested for or suspected of molesting his daughter.

Relator made no attempt to introduce any evidence at the hearing or offer any factual allegations about how he has been actually prejudiced by the delay. His allegations in the writ application speculate that he "may not have any significant memory of that period of his life," that he "may not remember who would or would not be a good witness on his behalf," that the "[victim] has almost no memory of the events,"

21

and that his attorney would not be able to test the victim's memory as to the surrounding events, such as clothing worn, time of day, exact location, presence of others, health or emotional problems, medication, weather, and other facts relator thinks will impact on the victim's credibility.

There is no indication that any of relator's concerns have materialized. Relator does not allege specific, actual prejudice, but merely alleges general prejudice in preparation of the defense. General allegations of prejudice in the preparation of the defense and allegations of "potential" prejudice are insufficient to support a due process violation based on preaccusation delay. *See Marion*, 92 S.Ct. at 466; *Hughes*, 94-1364 at p. 6, 648 So.2d at 493. Thus, regardless of the state's reasons for delaying the institution of prosecution in this case, relator has failed to meet his burden of establishing prejudice from the delay.

*Id*. at 559-61.

Defendant relies on *Gray*, 917 S.W.2d 668, to support his claim that the prosecution should be dismissed. In *Gray*, the Tennessee Supreme Court set out the following factual information:

In the case before the Court, Perdue has accused Gray of sexually penetrating her when she was eight years old in early 1950. She testified that for more than forty years-until March 26, 1992-she kept her silence about the incident. There is no evidence in the record that Gray tried to conceal his alleged conduct or that he threatened the victim in any way. Perdue testified that she had been "bothered" by her memory of the incident throughout her childhood and adult life. Finally, the record shows that she continued to interact with the defendant through the years. Under these facts, the trial court correctly held that forty-two years "is much too long to wait before prosecuting an alleged offense where the prosecutor [victim] is of legal age for the great majority of this time...."

In *Gray*, the Tennessee Supreme Court noted that its reasoning was "consistent with the legislature's intent because it has since amended the statute of limitations in child sex abuse cases so that prosecution must be initiated within four years or no later than the date the child reaches majority, whichever occurs later. Tenn.Code Ann. § 40-2-101(d) (1990)." *Id*. at 671-72.

22

The court then discussed the standard applicable to pre-accusatorial delays as follows:

> Having reviewed the existing law on the issue, we observe that the *Marion-Dykes* approach to pre-accusatorial delay is, in application, extremely one-sided.[4]  It places a daunting, almost insurmountable, burden on the accused by requiring a demonstration not only that the delay has caused prejudice but also that the State orchestrated the delay in order to obtain a tactical advantage.  Thus, under the facts before us, application of so stringent a standard would force a result we would consider unconstitutional, unwarranted, and unfair.  To accomplish justice while preserving Gray's right to a fair trial requires, in our view, a less stringent standard.
>
> Today we articulate a standard by which to evaluate pre-accusatorial delay and hold that an untimely prosecution may be subject to dismissal upon Fifth and Fourteenth Amendment due process grounds and under Article I, §§ 8 and 9, of the Tennessee Constitution even though in the interim the defendant was neither formally accused, restrained, nor incarcerated for the offense.  In determining whether pre-accusatorial delay violates due process, the trial court must consider the length of the delay, the reason for the delay, and the degree of prejudice, if any, to the accused.  *See Lovasco,* 431 U.S. at 790, 97 S.Ct. at 2048-49 ("proof of prejudice is generally a necessary but not sufficient element of a due process claim, ... the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused").
>
> We now apply the standard we have articulated to the facts and circumstances here present to determine whether the prosecution of Gray shall proceed.  We hold that it shall not.  We find that the length of the delay was profoundly excessive, and no reasonable justification for such delay has been demonstrated.  Gray has made a *prima facie* showing of prejudice.  As the trial court correctly found, the record reveals at least three instances of prejudice: (1) the lapse of time has diminished the victim's memory; (2) witnesses thought to be material are now unavailable; and (3) the victim cannot specifically date the incident, thereby requiring Gray to account for his whereabouts and his conduct during a six-month period forty-two years past.
>
> As the Supreme Court declared in *Morrissey v. Brewer*, "due process is flexible and calls for such procedural protections as the particular situation demands."  408 U.S. 471, 481, 92 S.Ct. 2593, 2600,

---

[4]The court was referencing *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455 (1971), and *State v. Dykes*, 803 S.W.2d 250 (Tenn.Crim.App.1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn.2000).

33 L.Ed.2d 484 (1972); *accord State v. Pearson*, 858 S.W.2d 879, 885 (Tenn.1993). Finally, under the facts of this case, prosecution of Gray would violate the concepts of fundamental fairness and substantial justice embodied in the due process clause of the Fifth and Fourteenth Amendments of the United States Constitution, as well as Article I, § 8, of the Tennessee Constitution.

Accordingly, the judgment of the Court of Criminal Appeals is reversed; the trial court's order dismissing the indictment is reinstated.

*Id*. at 673-74 (footnote omitted).

The court in *Gray*, 917 S.W.2d 668, however, adopted a standard that has not been adopted in Louisiana, as evidenced by the first circuit's decision in *Smith*, 809 So.2d 556. Further, in *State v. Utley*, 956 S.W.2d 489 (Tenn.1997), the Tennessee Supreme Court limited the holding in *Gray*, 917 S.W.2d 668, to the unique facts of that case. Further, *Gray* is distinguishable. In footnote three of that opinion, the court noted that in Tennessee, legislation requires that prosecution of child sex abuse cases must be instituted within four years or no later than the date the child reaches the age of majority, whichever occurs later.

The Louisiana legislature has chosen to provide more protection to the child victims of sex offenses. For example, La.Code Crim.P. art. 571 provides no time limit for the institution of prosecution for cases involving the offenses of aggravated rape, which is punishable by life imprisonment, and forcible rape. Additionally, La.Code Crim.P. art. 571.1 provides:

Except as provided by Article 572 of this Chapter, the time within which to institute prosecution of the following sex offenses: sexual battery (R.S. 14:43.1), second degree sexual battery (R.S. 14:43.2), oral sexual battery (R.S. 14:43.3), felony carnal knowledge of a juvenile (R.S. 14:80), indecent behavior with juveniles (R.S. 14:81), molestation of a juvenile (R.S. 14:81.2), crime against nature (R.S. 14:89), aggravated crime against nature (R.S. 14:89.1), incest (R.S. 14:78), or aggravated incest (R.S. 14:78.1) which involves a victim under seventeen years of age, regardless of whether the crime involves force, serious physical injury, death, or is punishable by imprisonment at hard

labor shall be thirty years. This thirty-year period begins to run when the victim attains the age of eighteen.

Defendant alleges that because of the passage of time, P.B. could not distinguish between the alleged rape and touching and witnesses failed to recall due to the passage of time. Defendant does not specifically assert what the other witnesses failed to recall but merely makes a conclusory allegation.

We find that P.B. did not have problems recalling the inappropriate acts committed by Defendant. However, she did not recall the dates on which these acts occurred. We further find that Defendant cannot prove he was prejudiced by the delay in this case. Alleging that other crimes evidence would not have been allowed pursuant to La.Code Evid. art. 412.2 is not sufficient, as the evidence may have been admissible under La.Code Evid. art. 404(B).

Based on the first circuit's decision in *Smith*, we find that Defendant was not prejudiced by the delay. Therefore, the prosecution in the case at bar should not be dismissed.

Defendant also asks this court to assume prejudice because of the forty-year delay. This has never been the law. and we decline to adopt such a rule. *See U.S. v. Beszborn*, 21 F.3d 62 (5th Cir. 1994), *cert. denied sub nom. Westmoreland v. U.S.*, 513 U.S. 934, 115 S.Ct. 330 (1994). Defendant further asks this court to issue a bright-line rule that prohibits prosecutions for "offenses such as these" without both corroboration and contemporaneous report to the authorities. We also decline to adopt such a bright-line rule based on the provisions of La.Code Crim.P. arts. 571 and 571.1.

For the reasons set forth herein, this assignment of error lacks merit.

*Other Crimes Evidence*

In his second assignment of error, Defendant contends that La.Code Evid. art. 412.2 is unconstitutional as applied and the trial court erred in allowing the introduction of other crimes evidence.

The State filed a "Notice of Intent to Introduce Evidence of Other Crimes" on March 18, 2008. Therein, the State gave notice of its intent to introduce evidence of the Defendant's conduct with C.H. and D.H. under La.Code Evid. arts. 404(B) and 412.2.

Defendant filed a "Motion to Declare Louisiana Code of Evidence Article 412.2 Unconstitutional" on July 14, 2008. Therein, Defendant asserted that Article 412.2 was vague because it allowed for the admission of another crime, wrong, or act involving sexually assaultive behavior and acts which indicate a lustful disposition toward children, but failed to set forth any guidelines as to what constitutes sexually assaultive behavior and does not provide any safeguards to define or limit acts which indicate a lustful disposition toward children. Defendant also asserted he was denied equal protection because Article 412.2 singled out one class of criminal prosecutions, sex offenses, from all other prosecutions in that other crimes evidence is admissible in sex offense cases for its bearing on any matter to which it is relevant and is admissible in non-sex offense cases as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In addition, Defendant asserted that Article 412.2 denied him a fair trial by depriving him of his right to be presumed innocent until proven guilty. He also asserted that the article denied him the right to a fair trial, to present a defense, to full confrontation and cross-examination, and to effective assistance of counsel because the article merely

26

requires the State to provide notice of the nature of any such evidence. Defendant further asserted that to the extent Article 412.2 was interpreted differently than La.Code Evid. art. 404(B), Article 412.2 denied him the right to a fair trial, to effective assistance of counsel, and due process. Specifically, if it was determined that he was not entitled to a pre-trial hearing and determination of admissibility, he would be effectively denied any of the safeguards recognized by the Louisiana Supreme Court for the introduction of other crimes evidence as set out in *State v. Prieur*, 277 So.2d 126 (La.1973). Further, Article 412.2 allows the admission of evidence of acts which indicate a lustful disposition toward children without requiring the State to provide meaningful notice at a pre-trial hearing of what it intends to offer to show a lustful disposition. Defendant further asserted that he would be denied a fair trial and due process if evidence of lustful disposition was admitted when he was charged with aggravated rape. In support of this argument, Defendant cited *State v. Kennedy*, 00-1554 (La. 4/3/01), 803 So.2d 916, *superseded by statute as stated in State v. Zornes*, 34,070 (La.App. 2 Cir. 4/3/02), 814 So.2d 113, *writ denied*, 02-1280 (La. 11/27/02), 831 So.2d 269, wherein he asserts the supreme court stated that evidence of other crimes was inadmissible in cases involving general intent crimes like aggravated rape. Lastly, the Defendant asserted that Article 412.2 denied him the right to be free of cruel and unusual punishment.

At a hearing on the motion, the trial court asked defense counsel if he was there to challenge the use of evidence under Article 412.2 without a prior hearing. Defense counsel asserted this was correct and stated the following: "I think, if we have a full-blown hearing on the admissibility of the other-crime evidence sought by the State to be introduced and we can cross examine those witnesses, then probably 412.2

27

would be constitutional under those circumstances. But, without it, it's not." The following exchange occurred later:

> MR. STUTES: -- are we still going to have -- Is this motion still viable, or are we still arguing this motion?

> THE COURT: Well, he's indicated that, since we're having a hearing, that he is not going to challenge -- he's only challenging the constitutionality based on our failure to have a hearing. Is that correct, Mr. Guilbeau?

> MR. GUILBEAU: If the Court would happen to rule, though, that general-intent crimes can be -- specific-intent crimes can be used to introduce -- against -- as other-crime evidence on a general-intent crime, such as aggravated rape, of course, we reserve our right to argue that point.

> THE COURT: Okay. Well, let me make sure I understand what you're saying here, because I know that you did bring to my clerk some cases that were decided before 412.2 was enacted, some Fourth Circuit cases that relied on *Kennedy*. Okay?

> But, since that time, 412.2 has been enacted, and, since that time, there have been a number of decisions -- even some from the Supreme Court -- which have talked about this type of evidence being admissible both as 404(B) evidence and 412.2 evidence.

> MR. STUTES: Correct. Yes.

> THE COURT: So those cases --

> MR. GUILBEAU: I don't think those cases went to the heart of the constitutionality of 412.2, vis-a-vis the fact that this evidence comes in without a hearing.

> THE COURT: No. I know that.

> MR. GUILBEAU: I think that expo [sic] facto and all those arguments –

> THE COURT: Okay. Wait. We're past that, though, because we're going to have a hearing. Okay?

> But then you just raised another issue that you said that you're going to challenge the constitutionality on. And what I'm telling you is I understand that you have the right to object if I determine it's admissible, but there are some -- there are -- have been a number of

28

cases that I think have addressed the issue of 412.2 and 404 (B) that are after the ones that you cited. So. . .

At the hearing, C.H. testified that she was at the home of Defendant, her uncle, in 1989. C.H. was nine or ten years old at that time. C.H. was sitting in front of Defendant on a four-wheeler and he touched her vagina, over her clothing. On another occasion, C.H. was lying on a pallet on the floor of Defendant's home with A.C., when Defendant rubbed her vagina. C.H. testified that after that time, she was never alone when she visited Defendant's home.

D.H. testified that she was the sister of C.H. and that Defendant was her godfather. D.H. testified that when she was seven or eight years old, Defendant put his hand up her skirt and she felt his fingers go inside her panties and that he touched the bottom of her buttocks. Within the same year, Defendant rubbed her chest, over her clothes. She was never alone with Defendant again.

Defendant denied touching C.H. and D.H. and raping P.B.

At the conclusion of the hearing, defense counsel argued that the other crimes occurred over twenty years ago and were not res gestae. Defense counsel argued that *Kennedy*, 803 So.2d 916, was still good law and that evidence of specific intent crimes such as molestation of a juvenile were not admissible at the trial for aggravated rape, which is a general intent crime. He also argued that the other crimes at issue in the case at bar were attenuated and would be devastating to his case. He further argued that the evidence was highly prejudicial.

The trial court noted that *Kennedy* was the genesis of the legislature's enactment of Article 412.2. The trial court then found that the evidence was highly prejudicial, but considered the following factors before finding the evidence was admissible at trial:

Number one, in all of these instances, the approach to the victims is the same. They are relatives. They are brought over or encouraged by their parents to visit with them. They are -- At least in the case of these two victims, they are approached in a situation where there is no one else there to witness the events that take place.

And the Court finds that that is the type of evidence that is contemplated by 412.2. And, although I admit it is very prejudicial evidence, it is also highly probative in the sense of someone's sexual predisposition toward children. And the Court is -- finds that it would be admissible under that article.

I also want to point out that, in *State Versus Zorn*[*es*], which -- Let's see. The cite of that is 814.113. This was a Second Circuit case. But it came at a time before 412.2 was actually enacted. In that case, other-crimes evidence of sexual assault against a child was admitted under 404 (B).

And the Court reasoned that, although intent was not an issue in that case -- and, under *State Versus Kennedy*, other crimes would not be admitted to prove intent -- the Court found that, because the defendant alleged that the entire incident was fabricated -- which, in this case, this defendant has just testified -- the occurrence of a crime was at issue and the sexual assaultive behavior on the other children was therefore admissible for purposes of showing occurrence of a crime through common design.

And so I feel that, even under 404, under these facts, this case would also -- these crimes -- other incidents would also be admissible.

Defense counsel objected to the ruling.

In brief to this court, Defendant asserts the testimony at issue was improperly admitted for the following reasons: 1) the evidence was used to prove he was a "bad man;" 2) use of the evidence denied him a fair trial in light of the forty-year delay in bringing the charge of aggravated rape; 3) the evidence was irrelevant and inadmissible under *Kennedy*, 803 So.2d 916; 4) use of the evidence under La.Code Evid. art. 412.2 was an ex post facto "application of a liberalized burden of proof;" and 5) the jury was not instructed as to the burden of proof required to use other crimes evidence.

Defendant asserts that requiring him to defend against the charge of aggravated rape and the other crimes evidence denied him the right to a fair trial by the loss of his right to be presumed innocent. Defendant further asserts that the State wanted to have the evidence at issue categorized as admissible under the lustful disposition language of Article 412.2. However, a statute permitting an act does not make that act constitutional.

Defendant asserts that intent, motive, system, or identity were not at issue and none of the exceptions for the admissibility of other crimes evidence were present. He contends the sole reason for introduction of the evidence at issue was to horrify and enrage the jury and to make the jury believe he was predisposed to commit the offense at issue. Defendant asserts that whether the jury believed P.B. became moot following the testimony of C.H. and D.H.

At the hearing on Defendant's "Motion to Declare Louisiana Code of Evidence Article 412.2 Unconstitutional," defense counsel stated that if a hearing regarding the admissibility of other crimes evidence was held and he was able to cross-examine the witnesses, "then probably 412.2 would be constitutional under those circumstances." He later argued that evidence of specific intent crimes should be inadmissible at a trial for a general intent crime such as aggravated rape. Thus, we find that Defendant waived his argument regarding the constitutionality of Article 412.2 and that the trial court did not rule on the constitutionality of Article 412.2. Thus, that issue is not considered by this court.

Louisiana Code of Evidence Article 412.2 provides, in pertinent part:

> A. When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused's commission of another crime, wrong, or act

31

involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.

Louisiana Code of Evidence Article 404(B) provides, in pertinent part:

(1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

In *State v. Mayeux*, 06-944 (La.App. 3 Cir. 1/10/07), 949 So.2d 520, the defendant was convicted of forcible rape. The victim was the fourteen-year-old next door neighbor of the defendant and often babysat for his young children. One night in the summer of 1999, the defendant's daughter, two other girls, and the victim had a sleep-over in the Defendant's camper, which was parked in the yard at his house. During the night, after the girls fell asleep, the defendant entered the camper where the victim was sleeping, held the victim's hands over her head, and had sexual intercourse with her.

On appeal, the defendant argued that the trial court erred when it allowed other crimes evidence to be submitted to the jury. The other crime was a sexual battery committed against the half-sister of the victim of the forcible rape. Testimony indicated the victim of the sexual battery was sleeping in the defendant's living room with another girl and the defendant's daughter when the defendant entered the room, and after turning on the TV and watching it for a while, pulled the covers off the victim and performed oral sex on her.

The defendant argued that this evidence was inadmissible under Article 404(B) and the State argued the evidence was admissible under Article 412.2. This court found the evidence was admissible, stating the following:

> In *State v. Patterson*, 05-560 (La.App. 5 Cir. 1/31/06), 922 So.2d 1195, the fifth circuit agreed that the use of other crimes evidence under Article 412.2, while prejudicial, was appropriate. In *Patterson*, the accused was charged with aggravated rape and evidence of a conviction for a simple rape was introduced. The fifth circuit stated:
>
>> Turning to the present case, the incident involving T.K. is highly relevant to show the defendant's lustful disposition toward teenage girls. It also shows his propensity to sexually assault teenage girls while armed with a dangerous weapon while they are home with no other adult present. For the same reason that the evidence is probative, the evidence of the prior sexual conduct is prejudicial to defendant. *State v. Olivieri*, [03-563 (La.App. 5 Cir. 10/28/03),] 860 So.2d [207] at 219. However, as observed by *Olivieri*, by enacting Article 412.2, the Louisiana Legislature evidently saw a need to lower the obstacles to admitting propensity evidence in sexual assault cases. *Id*. at 219. Considering the purpose behind Article 412.2, we fail to find that the evidence was so prejudicial so as to warrant its exclusion because there is no indication that the other crimes evidence confused or misled the jury, the evidence was presented in an orderly manner, with evidence of the prior sexual conduct being presented at the end of trial, clearly and succinctly through the testimony of the victim of that offense. Further, the trial court gave a limiting instruction on the other crimes evidence during the final jury charges. Thus, there was little chance the jury could confuse the facts of the two crimes.
>
> *Id*. at 1204. *See also*, *State v. Zornes*, 34,070 (La.App. 2 Cir. 4/3/02), 814 So.2d 113, *writ denied*, 02-1280 (La.11/27/02), 831 So.2d 269, wherein the accused was charged with aggravated rape and evidence of a similar crime was allowed to be introduced to show the occurrence of a crime through a common design. . . .
>
>    . . . .
>
> We find the trial court did not abuse its discretion when it permitted the introduction of the evidence of the sexual offense committed against D.S.R. The evidence was relevant to show

33

Defendant's lustful disposition toward young teenage girls. While one incident involved rape and one incident involved oral sexual contact, in both cases, Defendant sought out fourteen-year-old girls, who were guests in his home, late at night after they fell asleep.

*Id*. at 528-29 (alteration in original).

The other crimes evidence in the case at bar involves the touching of Defendant's nieces while they were at his residence. Further, the offense of aggravated rape was committed against Defendant's niece while she was at his residence. We find that the other crimes evidence is relevant to show Defendant's lustful disposition toward young girls, particularly his nieces. For the same reason that the evidence is probative, the evidence of other sexual offenses is prejudicial. However, the legislature, when enacting Article 412.2, saw a need to lower the obstacles to admission of propensity evidence in sexual assault cases. *State v. Olivieri*, 03-563, (La.App. 5 Cir. 10/28/03), 860 So.2d 207. Based on the purpose behind the enactment of Article 412.2, we find that the evidence was not so prejudicial as to warrant exclusion, as there was no indication the other crimes evidence confused or misled the jury, the evidence was presented in an orderly manner, with evidence of the other crimes presented at the end of the State's case. Further, the trial court gave the following limiting instruction regarding other crimes evidence:

> Evidence has been presented concerning other offenses which the defendant is alleged to have committed. The State was allowed to introduce this as evidence solely to establish motive, intent, knowledge, identity, and/or lustful disposition toward children. It is to be considered by you only for that purpose. It is not to be considered by you as proof of the character of the defendant in order to show that he acted in conformity therewith.
>
> Remember, the accused is on trial only for the offense charged. You may not find him guilty of this offense merely because of the evidence regarding other alleged offenses.

Thus, there was little chance the jury could confuse the facts of the crimes.

Additionally, in *State v. Willis*, 05-218, p. 31 (La.App. 3 Cir. 11/2/05), 915 So.2d 365, 388, *writ denied*, 06-186 (La. 6/23/06), 930 So.2d 973, *cert. denied*, 549 U.S. 1052, 127 S.Ct. 668 (2006), this court stated, "the fact that the prior sex offenses occurred many years before trial is not significant as the legislature did not set forth a time limitation in Article 412.2."

The other crimes evidence at issue would be admissible under Article 404(B) pursuant to the second circuit's decision in *Zornes*, 814 So.2d 113, to show the occurrence of a crime through a common design.

Next, Defendant asserts the other crimes evidence at issue in the case at bar is inadmissible insofar as his intent was not at issue. Defendant asserts that he denied this offense. Thus, evidence of other crimes, acts, or wrongs involving alleged sexually assaultive behavior or to show a lustful disposition toward children was absolutely inadmissable. In support of this argument, Defendant cites *Kennedy*, 803 So.2d 916, wherein the supreme court found that specific intent was not at issue. Thus, other crimes evidence was not admissible to prove the defendant's bad character. Defendant then asserts that evidence of lustful disposition was not admissible unless intent was at issue. In support of this argument, Defendant cites *State v. Miller*, 98-301 (La. 9/9/98), 718 So.2d 960.[5] Defendant asserts that since his intent was not at issue, evidence of other crimes was not admissible.

Defendant further asserts that the evidence at issue was not relevant to this case. He alleges that evidence designed to show propensity to commit the charged

---

[5]*Miller* involved the admission of evidence under Article 404(B) and was decided before the enactment of Article 412.2.

offense is "not admissible absent an exception."  Defendant then asserts that lustful

disposition is an exception, but does not create its own relevance.

In *Willis*, 915 So.2d at 375, this court stated the following regarding *Kennedy*,

803 So.2d 916:

> In *Kennedy*, 803 So.2d 916, the supreme court held that absent a
> dispute as to whether the accused intended to commit the crime,
> evidence of other crimes was prohibited to show intent when the crime
> charged was a general intent crime.  The Defendant argues that *Kennedy*
> is applicable in the case at bar.  However, the decision in *Kennedy* was
> implicitly overruled by the legislature's enactment of Article 412.2.

In *Zornes*, 814 So.2d at 115 (alteration in original), the second circuit stated the

following regarding *Kennedy*, 803 So.2d 916:

> following *State v. Kennedy*, *supra*, the legislature enacted La.C.E. art.
> 412.2 for the purpose of allowing evidence of (an)other offense(s) in
> sexual assault cases or in cases involving sex offenses against minors
> regardless of whether the charged offense is a general intent or specific
> intent crime.  This legislative decision corresponds to the suggestion set
> forth in the concurrence of Justice Victory in *State v. Kennedy*, *supra* at
> 925-926.

*Kennedy*, 803 So.2d 916, has been implicitly overruled and is inapplicable to

the case at bar.  Further, the other crimes evidence is relevant to prove Defendant's

lustful disposition toward children under Article 412.2 and to prove a common design

under Article 404(B).

Defendant notes that he is aware that the legislature enacted Article 412.2 in

response to *Kennedy*, 803 So.2d 916, and of this court's decision in *Willis*, 915 So.2d

365, which found that Article 412.2 does not violate the ex post facto clause.

However, he asserts that the Louisiana Supreme Court has yet to weigh in on this

issue and has expressly indicated that ex post facto application of Article 412.2

remains an open question.  *See State v. Morgan*, 02-3196 (La. 1/21/04), 863 So.2d

520 n.2.  Thus, to the extent Article 412.2 admits evidence of other crimes, wrongs,

or acts to show lustful disposition, the Article is unconstitutional and cannot be used as a basis to introduce evidence of other crimes.

Defendant failed to indicate, in his "Motion to Declare Louisiana Code of Evidence Article 412.2 Unconstitutional" the basis for his allegation that Article 412.2 violates the ex post facto clause. Furthermore, the issue was not raised at the hearing on Defendant's motion and was not considered by the trial court in its ruling on the motion. Thus, this issue will not be considered by this court. Additionally, as previously discussed, Defendant waived any argument regarding the constitutionality of Article 412.2.

Defendant contends that the jury was not instructed regarding the burden of proof with regard to other crimes evidence. Defendant asserts that without guidance as to the elements of the non-charged other crimes, the jury could have found that the non-charged crimes had been proven even if all elements of the offenses were not present. Further, he asserts that the State should have been required to prove the non-charged crimes by clear and convincing evidence and the jury should have been so instructed.

There is no indication in the record that Defendant requested an instruction regarding a clear and convincing burden of proof or that he objected to a lack thereof. Thus, Defendant may not now ask this court to find that the trial court erred in failing to give such an instruction since he has waived any error regarding this issue. La.Code Crim.P. art. 841.

37

*Excessive Sentence*

In his third assignment of error, Defendant contends that the trial court erred in imposing a life sentence. Defendant asserts that he could not have been ordered to serve more than twenty years at hard labor.

As noted in *Breaux*, __ So.3d __, the penalty for aggravated rape between 1950 and September 8, 1977, was death. However, that penalty could not be carried out. However, at the time of the offense in the case at bar, a jury was authorized to return the following verdicts:

Guilty.

Guilty without capital punishment.

Guilty of attempted aggravated rape.

Guilty of simple rape.

Not guilty.

La.Code Crim.P. art. 814 (1967). Louisiana Code of Criminal Procedure Article 814 was amended, effective July 2, 1973, to delete the responsive verdict of "guilty without capital punishment." 1973 La. Acts No. 126, § 1. Furthermore, from 1967 until July 26, 1972, La.Code Crim.P. art. 817 provided in pertinent part, "[i]n a capital case the jury may qualify its verdict of guilty with the addition of the words 'without capital punishment,' in which case the punishment shall be imprisonment at hard labor for life." From July 26, 1972 until July 2, 1973, Article 817 provided:

In a capital case the jury may qualify its verdict of guilty as follows:

(1) With the addition of the words 'without capital punishment,' in which case the punishment shall be imprisonment at hard labor for life, or

(2) With the addition of the words, 'without capital punishment or benefit of parole, probation, commutation or suspension of sentence,'

38

in which case the punishment shall be imprisonment at hard labor for life without benefit of parole, probation, commutation or suspension of sentence.

1972 La. Acts No. 502.

In *State v. Craig*, 340 So.2d 191 (La.1976), the supreme court discussed the penalty applicable in aggravated rape cases after the death penalty was declared unconstitutional, as follows:

> The defendant has thus been convicted of a crime whose penalty has been declared unconstitutional. This problem is not a new one, however. After the United States Supreme Court decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), which declared the death penalty as then applied unconstitutional, this court remanded murder and rape cases where death had been imposed for resentencing to life imprisonment. See e.g. *State v. Franklin*, 263 La. 344, 268 So.2d 249 (1972), a murder case; *State v. Singleton*, 263 La. 267, 268 So.2d 220 (1972), an aggravated rape case. The precedent for such action had been established in *State v. Shaffer*, 260 La. 605, 257 So.2d 121 (1971), where the problems were discussed, and *State v. Duplessis*, 260 La. 644, 257 So.2d 135 (1971), following the reversal by the United States Supreme Court of our judgment "insofar as it imposes the death sentence" for a "*Witherspoon*" violation. *Duplessis v. Louisiana*, 403 U.S. 946, 91 S.Ct. 2282, 29 L.Ed.2d 856 (1971).

> However, a different situation exists now than at the time of *Franklin* and *Singleton*, supra. At the time those cases were decided, C.Cr.P. 814 provided for a responsive verdict of "guilty without capital punishment" for murder and aggravated rape. C.Cr.P. 817, at that time, also authorized the "qualified" verdict of "guilty without capital punishment," in which case the sentence would be life imprisonment. Thus, reasoning that the responsive verdict of guilty without capital punishment was the next authorized verdict for the crime, we remanded for resentencing as if that verdict has been returned, and, under C.Cr.P. 817, life imprisonment was called for.

> The situation has changed. In an attempt to overcome *Furman's* objections to the death penalty, the legislature amended the murder statute to provide for first and second degree murder, making death mandatory for first degree murder. Likewise, the death penalty for aggravated rape was mandatory. To accomplish this, the legislature amended C.Cr.P. 814 to do away with the responsive verdict of "guilty without capital punishment" for first degree murder and aggravated rape. Thus, at the time this crime was committed, **November 26, 1974**, the only responsive verdicts to a charge of aggravated rape were guilty;

39

guilty of attempted aggravated rape; guilty of simple rape; not guilty. Additionally, C.Cr.P. 817 was amended to delete the provision authorizing the qualifying verdict "guilty without capital punishment." Thus there is no longer any authority for us to remand an aggravated rape case for resentencing to life.

At the time (**November 26, 1974**) this crime was committed, attempted aggravated rape was punishable by imprisonment for not more than twenty years. R.S. 14:27 D(1). Simple rape carried a penalty of one to twenty years. R.S. 14:43. Thus, following the reasoning of *Franklin* and *Singleton*, supra, we remand this case for resentencing of defendant to the most serious penalty for the next lesser included offense. The legislature obviously intended to impose the most serious penalty available under the law. In this case, although there is a range of from one to twenty years, the most serious penalty is twenty years at hard labor.

*Id*. at 193-94 (emphasis added).

In *State v. Batiste*, 371 So.2d 1164 (La.1979), the supreme court discussed the

issue again, explaining in pertinent part:

We find, however, an error patent in the sentence imposed. At the time the offense was committed (**1970**), death was the statutory penalty for rape. The jury was authorized to return a verdict of either guilty, guilty without capital punishment, guilty of attempted aggravated rape, guilty of simple rape, or not guilty. La.C.Cr.P. art. 814 (1950). The defendant was not tried until 1973, however, after the Supreme Court had declared unconstitutional the procedure by which the death penalty was imposed in Louisiana. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In the defendant's case the jury returned a verdict of guilty as charged. As the death penalty could not be imposed, the proper sentence is life imprisonment. *State v. Quinn*, 288 So.2d 605 (La.1974); *State v. Franklin*, 263 La. 344, 268 So.2d 249 (1972). We note that this will restore to the defendant the possibility of parole, probation, suspension or commutation of sentence.

*Id*. at 1165 (emphasis added).

In *State v. Johnson*, 429 So.2d 870 (La.1983), the defendant was convicted of

aggravated rape, the offense having occurred on September 16, 1972. The supreme

court reviewed the propriety of the lower court's reduction of the defendant's

sentence to twenty years and stated the following:

40

At the time of the commission of the offense and at the time of trial and conviction, aggravated rape was punishable either by death or by life imprisonment without probation, parole or suspension of sentence. Also at this time, La.C.Cr.P. Art. 817 accorded the option to a jury of qualifying its verdict of guilty in a capital case by adding the words "without capital punishment." In an effort to limit such excessive jury discretion, found objectionable in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the legislature amended both statutes, removing the provision which had previously allowed imposition of a life sentence pursuant to the jury's recommendation. For a complete historical discussion of these amendments, *see*, *State v. Jett*, 419 So.2d 844 (La.1982). As a result, defendants thereafter convicted of aggravated rape were automatically sentenced to death.

In 1976, however, *Selman v. Louisiana*, *supra*, declared unconstitutional Louisiana's mandatory death penalty for aggravated rape. The sentences of defendants previously convicted under the mandatory penalty scheme were vacated, this Court concluding that the appropriate sentence to be imposed upon a valid conviction for aggravated rape was the most severe constitutional penalty established by the legislature for a lesser included offense at the time was committed. *State v. Selman*, *supra*.

Defendant in the present case errs in characterizing his situation as analogous to that of defendants convicted of aggravated rape following the 1973 amendments to La.R.S. 14:42 and La.C.Cr.P. Art. 817. As noted above, the most severe constitutional penalty available for the offense of aggravated rape at the time of defendant's offense was life imprisonment at hard labor, without benefit of probation, parole or suspension of sentence. Thus, defendants convicted of aggravated rape and sentenced to death prior to 1973 found their sentences reduced only to life imprisonment. *State v. Singleton*, 263 La. 267, 268 So.2d 220 (1972); *see also*, *State v. Franklin*, 263 La. 344, 268 So.2d 249 (1972).

*Id*. at 871-72.

We note the following language by the first circuit in footnote three of its opinion in *State v. Handley*, 453 So.2d 1242 (La.App. 1 Cir.), *writ denied*, 457 So.2d 1199 (La.1984):

The offense of which defendant was convicted occurred on April 3, 1973. It is well settled that a defendant is to be tried under the statute in effect at the time of the commission of the crime. The death penalty sentencing provision for aggravated rape in effect on April 3, 1973 was declared unconstitutional in *Selman v. Louisiana*, 428 U.S. 906, 96 S.Ct. 3214, 49 L.Ed.2d 1212 (1976). However, from July 26, 1972 (effective

41

date of Acts 1972, No. 502) to July 2, 1973 (effective date of Acts 1973, no. 125) La.Code Crim.P. art. 817, as amended by Acts 1972, No. 502, provided in pertinent part:

Art. 817. Qualifying verdicts in capital and noncapital cases:

"In a capital case the jury may qualify its verdict of guilty as follows:

(1) With the addition of the words 'without capital punishment,' in which case the punishment shall be imprisonment at hard labor for life, or

(2) With the addition of the words, 'without capital punishment or benefit of parole, probation, commutation or suspension of sentence,' in which case the punishment shall be imprisonment at hard labor for life without benefit of parole, probation, commutation or suspension of sentence."

Accordingly either imprisonment at hard labor for life or imprisonment at hard labor for life without benefit of parole, probation, commutation or suspension of sentence would have been an appropriate sentence on this guilty verdict.

*Id*. at 1245.

Defendant cites *State v. Fraise*, 350 So.2d 154 (La.1977), in support of his proposition that he should receive a sentence of twenty years. In *Fraise*, the supreme court stated the following:

For the reasons set forth in *State v. Craig*, 340 So.2d 191 (La.1976), *State v. Lee*, 340 So.2d 180 (La.1976), and *State v. Sledge*, 340 So.2d 205 (La.1976), we have held that, because the legislature obviously intended to impose the most serious penalty available under law for the crime of aggravated rape, the appropriate penalty since the invalidation of the mandatory death penalty is the most serious penalty for a lesser-included offense at the time of the commission of the crime. At the time of the commission of the present offense (June 16, 1971), attempted aggravated rape was punishable by imprisonment at hard labor for not more than twenty years while the crime of simple rape carried a penalty of imprisonment at hard labor for not less than one nor more than twenty years. Consequently, the most serious penalty is twenty years at hard labor. Therefore, in accordance with our decisions

42

in *Craig* and *Lee*, we must vacate and set aside the imposition of the death penalty even though we affirm the conviction and remand the case to the trial court for resentencing.

*Id*. at 157-58 (emphasis added).

The bill of information charged that the current offense occurred between 1966 and 1972. At that time, the penalty for aggravated rape was death. However, that penalty was declared unconstitutional. Guilty without capital punishment was a responsive verdict to aggravated rape until July 2, 1973. Thus, a defendant who committed the offense of aggravated rape prior to that date would properly be sentenced to life imprisonment.[6]

In spite of the supreme court's ruling in *Fraise*, which we find is contrary to its statements in *Craig*, 340 So.2d 191, and *Batiste*, 371 So.2d 1164, Defendant was properly sentenced to life imprisonment. Accordingly, this assignment of error lacks merit.

### *Failure to Sequester the Jury*

In his fourth assignment of error, Defendant contends that if the procedural rules in effect in 1972 should be applied to his case, reversal is mandatory because the jury was not sequestered. Defendant asserts that reversal is required even if it is found that he acquiesced in the failure to sequester the jury.

In support of his argument, Defendant cites *State v. Luquette*, 275 So.2d 396 (La.1973), *overruled by State v. Taylor*, 93-2201 (La. 2/28/96), 669 So.2d 364, *cert. denied*, 519 U.S. 860, 117 S.Ct. 162 (1996), and *State v. Craighead*, 38 So. 28

---

[6]Between July 2, 1973, and September 12, 1975, a defendant convicted of aggravated rape was properly sentenced to twenty years. *State v. Sledge*, 340 So.2d 205 (La.1976). The statute for attempt, La.R.S. 14:27, was amended, effective September 12, 1975, to provided for a sentence of fifty years. 1975 La. Acts No. 132, § 1; *State v. Welch*, 368 So.2d 965 (La.1979). Thus, a defendant convicted of aggravated rape between September 12, 1975 and September 9, 1977 was properly sentenced to fifty years. On September 9, 1977, the penalty for aggravated rape was changed to provide for life imprisonment. 1977 La. Acts No. 343; *State v. Petrie*, 414 So.2d 304 (La.1982).

(La.1905), *overruled by Taylor*, 669 So.2d 364. In both cases, the supreme court held that in capital cases, the jury should not be permitted to separate after it has been sworn, either with or without consent of the defendant. Defendant further asserts that backstrikes would not have been allowed in 1972.

The State asserts that Defendant did not preserve these issues for appellate review, as Defendant acquiesced in and waived sequestration of the jury and engaged in the use of backstrikes. In support of its argument, the State cites *State v. Fussell*, 06-324 (La.App. 3 Cir. 9/27/06), 941 So.2d 109, *overruled on other grounds by State v. Fussell*, 06-2595 (La. 1/16/08), 974 So.2d 1223. In *Fussell*, 941 So.2d 109, the defendant claimed the jury was not fully sequestered, which was improper because it was a capital case. He asserted the jurors were allowed to run all over the courthouse during recess and lunch breaks. On review, this court found that the voir dire transcript revealed no objection regarding the lack of sequestration and that defendant did not reference any point in the record where such an objection was raised. Thus, the defendant's claim was not properly preserved for appellate review. This court further found that the sequestration rule for capital cases did not apply to the case. The State also cites La.Code Crim.P. art. 791(B) in support of its argument, which now provides that the State and defense may jointly waive jury sequestration in capital cases.

In *Breaux*, __ So.3d __, the defendant was charged with having sexual intercourse with his nieces between 1961 and 1980. During most of that time, the penalty for aggravated rape was death. In the error patent review, this court found the procedural rules for capital cases, such as unanimous jury and sequestration of the jury, should be applied in that case. *Id.* at 5. *See also D.T.*, 998 So.2d 1258. Thus,

we find that the procedural rules for capital cases were properly applied to the case at bar.

Prior to the commencement of trial, Defendant, with the acquiescence of the State, waived sequestration of the jury. We note that in *Luquette*, 275 So.2d 396, and *Craighead*, 38 So. 28, the supreme court held that a defendant could not waive sequestration of the jury in a capital case. Those rulings were handed down in 1973 and 1905 respectively. However, in *Taylor*, 669 So.2d 364, the supreme court discussed sequestration of the jury as follows:

> At the time of this trial, La.Code Crim.P. art. 791(B) provided: "In capital cases, after each juror is sworn he shall be sequestered." Under La.Code Crim.P. art. 788(A), an individual juror must be sworn immediately by the trial court after he has been accepted by the state and the defendant as a prospective juror. Once the jury selection process is completed, the entire jury panel is then sworn again by the trial court. La.Code Crim.P. art. 790.

> It was anticipated by the state and the defense that jury selection in this case would be lengthy. . . . After the first panel of 12 prospective jurors was examined and just before both sides were about to exercise their peremptory challenges, the trial court made the following ruling, outside the prospective jurors' presence, regarding sequestration and swearing:

> > THE COURT: Before bringing the prospective jurors in, I want to state for the record that this court is proceeding in accordance with Article 788, Section B, with regards to jury selection utilizing the system of simultaneous exercise of challenges. The Court will further note that under Article 790 of the Code of Criminal Procedure, that jurors are to be sworn at one time once all of the--when the selection of jurors and alternate jurors has been completed, and all issues properly raised under Article 795 have been resolved, the jurors shall be sworn together to try the case in a just and impartial manner. The Court in following the dictates of 790 and taking into consideration of 788 will allow counsel for the defense to exercise simultaneous challenges. However, the court will not swear these jurors in accordance with 790 in view of the fact that 791(B) dictates that each juror--after each juror is sworn sequestration is to take place, so this would be, the court

45

does not feel that if we select any persons from this panel that we could properly swear them because all jurors have not been selected. State do you have any objections to this procedure?

MR. SINQUEFIELD: No, your honor, I think it's a correct procedure.

THE COURT: Defense?

MS. JACKSON: No, sir.

MR. BOREN: No, your honor.

In accordance with this ruling, and without objection from either of the parties, jurors that were not peremptorily challenged were not immediately sworn, as La.Code Crim.P. art. 788(A) requires. Instead, the trial court informed the individual jurors that they would be serving on the jury, and allowed them to return to their homes and to work until the trial began. The trial court admonished the individual jurors not to discuss the case with anyone, not to listen to news accounts about the case, and not to read written reports about the case during this time. Once jury selection was completed, the entire jury panel, and the two alternates, were then sworn in accordance with La.Code Crim.P. art. 790.

The defendant now complains that this procedure violated the swearing requirement of Article 791(B), and that his conviction and sentence should be reversed since the violation deprived him of due process, a fair trial and an impartial jury.

From the trial court's statement quoted above and the colloquy thereafter, it is evident that the state and the defense agreed to, or at least acquiesced in, the procedure proposed by the trial court, which effectively consisted of a waiver of the sequestration requirement by delaying the individual swearing requirement of Article 788(A). Historically, this Court has adhered to the principle that an accused may not consent to waive the sequestration requirement. *State v. Luquette*, 275 So.2d 396 (La.1973); *State v. Craighead*, 114 La. 84, 38 So. 28 (1905); *State v. Hornsby*, 8 Rob. 554 (La.1844). The rationale behind this rule being that a "[d]efendant ought not to be placed in the position of having to consent, or perhaps prejudice the jury by withholding consent." *State v. Luquette*, 275 So.2d at 400, citing *State v. Craighead*, *supra*.

We find this jurisprudentially established rule unnecessary. This is reflected by recent legislative activity. During the 1995 legislative

46

session, La.Code Crim.P. art. 791(B) was amended by La.Acts Nos. 1172, § 1 and 1277, § 1, to provide:

> In capital cases, after each juror is sworn he shall be sequestered, *unless the state and the defense have jointly moved that the jury not be sequestered.* (Emphasis added.)

> With this change, it is clear that a waiver of the sequestration requirement is now possible.

> Since this amendment was enacted well after the defendant's trial, and did not become effective until August 15, 1995, it does not apply here. Nevertheless, it lends support to our conclusion that the jurisprudentially-created prohibition against waiver is no longer necessary. The concerns expressed in the cases cited above, namely, placing the defendant in a position of having to consent or prejudicing him in the eyes of the jury if he withholds consent, may be remedied by using the proper procedure. Considering the issue of waiver of sequestration, if it is even raised, outside the presence of prospective jury members would prevent jury members from becoming aware that the sequestration requirement may be waived. In the unlikely event that a jury member is aware of the possibility of waiver, he would still be unable to form prejudices against the defendant because it would be impossible to determine which party refused to consent to the waiver.

> The amendment to La.Code Crim.P. art. 791(B) also achieves this result. By requiring <u>both</u> the defendant and the state to agree to the waiver, the defendant is neither placed in a position of having to consent nor is he prejudiced by his refusal to consent to the waiver.

> Although 1995 La.Acts Nos. 1172, § 1 and 1277, § 1, effective August 15, 1995, changed the law regarding waiver of the sequestration requirement it may still have limited viability in previously tried cases. To this extent, we overrule those cases prohibiting waiver of the sequestration requirement. Because, at the very least, the defendant in this case impliedly waived the sequestration requirement by acquiescing in the trial court's proposed procedure, this assignment of error is without merit.

*Id*. at 380-81 (footnotes omitted).

In *State v. Robertson*, 97-177, p. 15 (La. 3/4/98), 712 So.2d 8, 23, *cert. denied*, 525 U.S. 882, 119 S.Ct. 190 (1998), the supreme court noted that in *Taylor*, 669 So.2d 364, it "recognized that even under the previous version of Article 791, a defendant could consent to the waiver of the sequestration requirement."

47

Although capital protections applied to Defendant's case, we find that under *Taylor*, 669 So.2d 364, *Robertson*, 712 So.2d 8, and La.Code Crim.P. art. 791(B), Defendant could waive sequestration of the jury. Furthermore, in *D.T.*, 998 So.2d 1258, 1264, this court stated the following:

> In this case, the State did not seek the death penalty. Defendant failed to assign this error in his appeal to this court, and he failed to allege or prove any prejudice suffered by this possible error. Accordingly, assuming the trial court erred in failing to sequester the jury, we find this error to be harmless. *See* [*State v.*] *Porter*, [99-1722 (La.App. 3 Cir. 5/3/00),] 761 So.2d 115, and [*State v.*] *Marcantel*, [98-825 (La.App. 3 Cir. 12/22/99),] 756 So.2d 366[, *writ denied*, 00-208 (La. 8/31/00), 766 So.2d 1274].

The State did not seek the death penalty in the case at bar, and Defendant failed to allege or prove the prejudice suffered as a result of the failure to sequester the jury. Thus, any error regarding failure to sequester the jury would be harmless.

Furthermore, defense counsel never objected to the use of backstrikes during jury selection. Thus, this issue was not properly preserved for appellate review. La.Code Crim.P. art. 841.

For the reasons set forth above, this assignment of error lacks merit.

## DECREE

For all of the foregoing reasons, Defendant's conviction and sentence are affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules—Courts of Appeal. Rule 2-16.3.